IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  11-cv-01683-LTB-MEH

TONYA BORWICK,

       Plaintiff,

v.

T-MOBILE WEST CORPORATION, d/b/a T-Mobile, a Washington corporation,

       Defendant.

_____

ORDER
_____

This matter is before me on Defendant T-Mobile West Corporation's ("T-Mobile") Motion

for and Memorandum in Support of Summary Judgment [**Doc # 23**].  Jurisdiction is proper under

28 U.S.C. §§ 451, 1331, 1337, and 1343.  After considering the parties' arguments, for the reasons

below, I GRANT the motion.

## I. Background

This case stems from T-Mobile's investigation and termination of Plaintiff Tonya Borwick

in early 2011.  The following is uncontroverted unless otherwise noted.

Borwick began working for T-Mobile as a customer service representative ("CSR") in 2002.

At the relevant times, Borwick was a financial care representative II–a type of CSR–in T-Mobile's

Thornton, Colorado, call-center.  Her primary duty was fielding call**s** from T-Mobile customers

whose accounts were delinquent or whose service had been disconnected due to non-payment.

Under T-Mobile's organizational structure, a CSR reports to a "coach;" a coach reports to

a "team manager;" and a team manager reports to the call-center's "associate director."  Borwick's

coach was Clara Diaz; Diaz's team manager was Helen Cordiner; and Cordiner reported to Melissa Utschinski, the Thornton call-center's associate director.

T-Mobile evaluates CSRs based on various metrics of performance. These include call resolution time, dollars collected per hour, the quality of the call, customer satisfaction, and the rate at which the customer calls back after speaking with a CSR. CSRs are ranked according to the sum of these metrics, and the rankings determine the order in which CSRs bid for shift times.

T-Mobile's Thornton call-center produced "short-call reports" on a monthly basis. These reports itemize the calls each CSR received for the corresponding month and detail how long each call lasted. T-Mobile identified that the "ideal" call resolution time for a financial care call, such as those Borwick received, was 200 seconds. If a CSR had a high percentage of calls lasting less than 30 seconds, that signals to T-Mobile that the CSR might be neglecting certain customer service items or that the CSR may be hanging up on customers. T-Mobile considers hanging up on customers customer mistreatment and grounds for immediate termination. T-Mobile terminated at least three CSRs from the Thornton call-center in late 2010 and early 2011 for hanging up on customers.

Jeff Winkelman worked for T-Mobile as a business support manager. His duties included regularly running reports for the Thornton call-center, including short-call reports, and reviewing them for abnormal or suspicious call activity. When reviewing the short-call report for December 2010, Winkelman noticed that Borwick's percentage of calls over 30 seconds was 80.57 percent, meaning that nearly 20 percent of her calls lasted less than 30 seconds. Additionally, 9.64 percent of her calls that month lasted only 11 to 20 seconds. Winkelman mentioned his findings to Cordiner in early to mid-January 2011.

On January 15, 2011, a group of T-Mobile employees including Borwick, Diaz, and Cordiner had a team potluck in the Thornton call-center's lunch room.  During the potluck, Diaz publicly mentioned to Cordiner that Borwick was pregnant.  Borwick alleges that Cordiner fell silent.  She further alleges that later during the potluck she mentioned to Cordiner that she would take her full 12 weeks of maternity leave under the Family Medical Leave Act ("FMLA") when her baby was born.  Cordiner has no recollection of Borwick making this statement.

On January 24, 2011, shift bids began for employees at the Thornton call center.  This was a process by which, every six months, employees bid for shift times.  Once shifts were assigned, employees could apply for a modification so as to accommodate other demands.  On January 27, 2011, Borwick submitted a request for modification on the basis that she needed time to do homework for her college courses.

In the last week of January 2011, Cordiner commenced investigating Borwick's short call report data.  She reviewed the December 2010 report and found that for that month, among CSRs at the Thornton call-center, Borwick had the highest percentage of calls lasting between 11 and 20 seconds and the highest percentage of calls under 30 seconds.  The short call report for January 2011 reveals similar results.  In January 2011, only 81.51 percent of Borwick's calls were over 30 seconds, and 11.57 percent were 11 to 20 seconds in length.  During that month Borwick also had the lowest percentage of calls over 30 seconds.

Cordiner's review of the December 2010 short call report prompted her to access T-Mobile's i360 system–the system used to record and store conversations between customers and CSRs–to listen to the audio recordings of Borwick's calls in the 11 to 20 second range.  She heard many calls that ended mid-sentence with Borwick talking.  Finding this unusual, Cordiner asked the call-

3

center's resource planning team to place a "trace" on Borwick's work phone. A trace records information about a CSR's calls, including their date, time, duration, and whether the CSR manually released the call.  CSRs could manually release a call in three circumstances: first, when the call was over; second, to transfer the call; and third, if the call was determined to be a "dead air call."  A dead air call is one during which the CSR cannot hear a customer on the other end of the line. In this circumstance, a CSR can manually release the call only after reading a "dead air script" over the phone to ensure that the customer was no longer on the line.  A CSR manually releases a call either by pushing a button on her telephone box or by selecting a button on her computer screen.  If the CSR does not manually release the call, it is released by T-Mobile's system when the customer hangs up. The trace reports indicated that Borwick manually released several calls in 11 to 20 second range.

On February 14, 2011, Cordiner and Diaz met with Borwick. Cordiner explained the trends in the recent short call reports, the calls dropped mid-sentence on the audio recordings, and the trace reports showing manually released calls. She verified that Borwick understood when a CSR was permitted to manually release a call. Borwick denied manually releasing the calls Cordiner had listened to but provided no alternative explanation for the evidence Cordiner presented.  Although Cordiner did not participate in the decision to deny Borwick's January 27 schedule adjustment request, during this meeting Cordiner also relayed to Borwick that her request had been denied.

Following the February 14 meeting, Cordiner continued investigating whether Borwick deliberately hung up on customers.  She discussed the situation with Winkelman because two CSRs in his chain of command were fired in early January 2011 for hanging up on customers, and another had been fired in October 2010. Cordiner also conferred with T-Mobile human resource generalist

Trish Golden. Golden recommended that Cordiner ask Borwick to listen to the calls to see if she could explain them.  Cordiner also continued to run trace reports after the February 14 meeting and noted that after that meeting manually released calls in the 11 to 20 second range ceased.

On February 18, 2011, Cordiner and Diaz met with Borwick again. At this meeting Cordiner played three audio recordings of calls under 30 seconds that ended mid-sentence while Borwick was speaking.  Borwick did not provide any alternative explanation for them. Cordiner offered to play additional calls for Borwick, but she refused to listen to them. Cordiner told Borwick that she would present the information to the human resources department.

Four days later, on February 22, 2011, Borwick delivered a letter to Thornton call-center director Dennis Carroll and human resources manager Janice Lopez alleging that Cordiner was harassing her because she was pregnant. In the letter, Borwick claimed that less than a month after Cordiner found out she was pregnant, she was being "forced to respond to false accusations that [she] [was] intentionally hanging up on customers."  Def.'s Br. Ex. 9 at 7.  She further stated that Cordiner's actions since learning of her pregnancy "have been directed with the sole purpose of starting a process for [her] eventual dismissal/termination while simultaneously creating a hostile work environment." *Id.* Borwick's letter also requested that Cordiner's investigation be "supervised to ensure fairness and impartiality."  Def.'s Mot. Ex. 9 at 7.

In response to Borwick's letter, Lopez did two things. She immediately removed Cordiner from the investigation into Borwick's suspicious call activity. Once removed, Cordiner had no further involvement in the investigation or Borwick's employment. Lopez then asked Utschinski, the Thornton call-center's associate director, to conduct an independent investigation into Borwick's conduct. Utschinski agreed and commenced her own investigation from scratch, not relying on

Cordiner's input or conclusions.

Utschinski reviewed the short call reports from September 2010 through January 2011. She found that Borwick's percentage of calls under 30 seconds was unusually high from September 2010 through November 2010 and that this percentage was higher in December 2010 and January 2011. Utschinski also reviewed the trace reports Cordiner ordered. She identified those calls on the trace reports that were under 30 seconds which Borwick had manually released. She then accessed T-Mobile's i360 system and listened to the recordings of those calls. Utschinski identified four calls from January 28, 2011, that all began with callers on the line and then cut-off mid-sentence while Borwick was speaking. Finally, Utschinski accessed T-Mobile's billing system, Samson, to review the call records that corresponded to those four calls. The call records show that Borwick had documented those four manually released calls as "dead air" by putting a "dead air" notation in the log. But on these four calls the customer could be heard on the audio recording, and Borwick did not read the required dead air script to ensure that the customer was no longer on the line. Based on her investigation, Utschinski concluded that Borwick had hung up on customers and had falsely documented those calls as "dead air." Utschinski brought her findings to Lopez.

The second thing that Lopez did in response to Borwick's February 22 letter was initiate her own investigation into Borwick's allegations against Cordiner. On the same day that Borwick delivered her letter Lopez met with Borwick to discuss her allegations. She later interviewed Cordiner, Golden, and another human resources generalist, Laurie Ulanowski, as they had first-hand knowledge of the events that led up to the day Borwick delivered her letter. Because the investigation into Borwick's allegations was intertwined with Utschinski's investigation, Lopez consulted with Utschinski regarding Lopez's investigation and Utschinski's findings. When Lopez

and Utschinski met, Lopez reviewed the evidence Utschinski had gathered and also concluded that Borwick had hung up on customers and falsely documented the calls as "dead air."

On February 28, 2011, Utschinski and Lopez met with Borwick. Utschinski walked Borwick through her investigation and presented the evidence. She then reviewed a true "dead air" call that Borwick had handled properly. Borwick told Lopez and Utschinski that she could not definitively explain what happened on those calls; but she offered possible explanations as to what could have happened: perhaps she accidentally hit the release button or had multiple accounts up simultaneously and documented the wrong calls as "dead air." Utschinski did not find these reasonable. CSRs must make a physical movement to manually release a call. They also take only one call at a time; they are trained to complete all notations in an account before moving on to the next call, and they have the ability to remove themselves from receiving calls so as to complete those notations. At this meeting Lopez explained to Borwick that the investigation into Borwick's dropped calls was unrelated to her pregnancy and was instead an issue of mistreating customers. Lopez asked Borwick to provide a written statement in her own words about the matter, but she refused. Utschinski told Borwick that because she could not provide a reasonable explanation for the dropped calls, and the evidence clearly showed she was intentionally hanging up on customers, T-Mobile was firing her.

Feeling aggrieved, Borwick filed suit in this Court, asserting three claims. The first is that T-Mobile fired her because she was pregnant in violation of 42 U.S.C. § 2000e-2(a). The second is that T-Mobile violated § 704 of Title VII, 42 U.S.C. § 2000e-3(a) by retaliating against her for complaining of pregnancy of discrimination. The third is that T-Mobile interfered with her right to take maternity leave in violation of the FMLA, 29 U.S.C. §§ 2615(a)(1), and 2617(a).

T-Mobile now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## II. Standard of Review

Summary judgement per Rule 56 "is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Concrete Works of Colo., Inc. v. City & Cnty of Denver*, 36 F.3d 1513, 1516 (10th Cir. 1994) (quoting Fed. R. Civ. P. 56(c)); *see also Klen v. City of Loveland, Co.*, 661 F.3d 498, 508 (10th Cir. 2011)). When applying this standard, I must view the evidence and draw all reasonable inferences therefrom in the light most favorable to Borwick as the nonmoving party. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005). A fact is material if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is genuine if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

As the moving party, T-Mobile bears the initial burden of making a *prima facie* demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670-71. To meet this burden, it need not disprove Borwick's claims; rather, it must "simply point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* If it meets this initial burden, the burden shifts to the nonmoving party, Borwick, to "set forth specific facts showing that there is an genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmovant may not rest upon its pleadings to do so. *Id.* Rather, she

must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (internal quotations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

### III. Discussion

#### A.
#### Genuine Dispute of Material Facts

Borwick attempts to raise genuine disputes over material facts. I address many of them when specifically considering whether her claims can withstand summary judgment. Some, however, are more appropriately addressed at the outset. Borwick argues a material factual dispute exists concerning the explanation T-Mobile proffers for firing her. T-Mobile asserts that it fired her for hanging up on customers; Borwick alleges that T-Mobile told her she was being fired because she could not provide a reasonable explanation for the manually released calls. To be sure, Borwick alleges that both of these explanations are pretext and that she was fired because she was pregnant. Borwick is simply arguing here that a genuine dispute exists as to which explanation T-Mobile gave her for firing her. This argument is spurious and semantic. It is also unsupported. The very document upon which Borwick relies upon in a futile attempt to manufacture this dispute states that "Utschinski advised that because she was not able to give a reasonable explanation for the [manually released calls] *and that the data clearly illustrates she repeatedly hung up on customers* that her employment was being separated." Def.'s Mot. Ex. 9 at 9. It is clear that T-Mobile's asserted reason for firing Borwick was for hanging up on customers.

Borwick also attempts to gin up a genuine dispute of material fact concerning the accuracy and completeness of the call recordings. She states that the recordings can be manipulated, that they

are incomplete, and that they do not match corresponding notes and screen shots. This was the subject of Borwick's prior Motion for Sanctions Due to Defendant's Spoilation of Evidence [Doc #24] and Magistrate Judge Hegarty's September 11, 2012, order [Doc # 36]. T-Mobile addressed these arguments in its response to Borwick's motion for sanctions. *See* Doc #27.  After reviewing the evidence before me, as well as the briefs and order related to Borwick's motion for sanctions, I conclude that no genuine dispute of material fact exists regarding the completeness and accuracy of the recordings. There is no evidence before me that the recordings were manipulated or are incomplete, and T-Mobile adequately explains the time gaps in the recordings.

Lastly, over the course of 11 pages in her response, Borwick attempts to demonstrate numerous other disputed issues of material fact.  *See* Pl.'s Resp. at 4-14. After reviewing the briefs and the evidence before me, I conclude that she fails to do so.

I already addressed many of the purported disputed facts in the previous paragraphs, and I will address many others in my analysis of Borwick's claims. As to those remaining, in many instances, T-Mobile admits certain facts that Borwick asserts are disputed.  *See, e.g.*, Def.'s Reply at 13, ¶¶ 2, 3-1, 4, 5. In other instances, the purported genuine dispute is illusory. For example, Borwick first disputes that T-Mobile identified 200 seconds as the "ideal" call resolution time for financial care calls. Pl.'s Resp. at 4 ¶ 1. Yet Brent Felderman, who at the time of the events in question was T-Mobile's human resource director and supervised Lopez, explicitly testified in his deposition that "200 seconds is ideal." *Id.* Ex. 7 at 29:22-24.  Winkelman stated the same in his affidavit. Def.'s Mot. Ex. 11 at 1 ¶ 6. Borwick offers no contradictory evidence.

Borwick also frequently fails to support her allegations.  This will not do. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by: citing to particular parts of materials in the record . . . ."); *Mackenzie v. Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005) ("Unsupported conclusory allegations . . . do not create an issue of fact."). She suggests that certain records T-Mobile provided can be manipulated but provides no evidence that this was done here or has ever been done. She also disputes that T-Mobile terminated at least three CSRs from the Thornton call-center in late 2010 and early for hanging up on customers. T-Mobile provided evidence supporting that it had done so; Borwick fails to provide any evidence that it had not. She similarly presents no evidence to refute that in December 2010 and January 2011, compared to other CSRs in the Thornton call-center, Borwick had the lowest percentage of calls over 30 seconds. These are just a few examples of where Borwick fails to support her assertions. *E.g.*, *compare* Pl.'s Resp. at 7 ¶ 7, *with* Def.'s Reply at 5 ¶ 7. Elsewhere Borwick distorts the evidence. She argues that "Utschinski never investigated Borwick's claim of pregnancy." Pl.'s Resp. at 10 ¶ 16. T-Mobile does not aver that Utschinksi did so; rather, it alleges that Utschinski investigated Borwick's suspicious call activity, and it proffers evidence to that effect. *See* Def.'s Mot. Ex. 4 at 2 ¶ 10.

In the interest of brevity, it suffices to say that each of Borwick's allegedly genuinely disputed facts fits into one or more these categories. Part I, *supra*, reflects facts which I conclude are not subject to genuine dispute unless otherwise noted. I now turn to Borwick's claims.

## B.
### Pregnancy Discrimination

"The Pregnancy Discrimination Act does not require any affirmative accommodations; it simply prohibits employers from treating pregnancy-related conditions 'less favorably than other medical conditions.' " *Falk v. City of Glendale*, 2012 WL 2390556, *4 (D. Colo. June 25, 2012) (citing *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 684 (1983)). A

11

plaintiff alleging pregnancy discrimination must show that she was treated differently than other co-workers who were not pregnant. *See id.* (citing *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012).   A pregnancy discrimination claim is examined under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Atchley v. Nordam Group, Inc.,* 180 F.3d 1143, 1148-49 (10th Cir. 1999). The first stage requires Borwick to show a *prima facie* case of discrimination. *Id.* This means showing that "(1) she is within the protected class; (2) she was doing satisfactory work; (3) she was discharged; and (4) her position remained open and was ultimately filled by a nonpregnant employee." *Id.* at 1148.

If Borwick can establish a *prima facie* case, the burden shifts to T-Mobile to produce evidence showing a "legitimate, nondiscriminatory reason" for terminating her. *Id.* If it does, the burden oscillates back to Borwick to show that there is a genuine dispute of material fact as to whether T-Mobile's proffered reason for firing her is "pretextual-i.e., unworthy of belief." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004); *accord Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007). Showing pretext is enough to survive summary judgment; Borwick need not have direct evidence that pregnancy was the actual reason for her termination. *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir. 1995).

In its motion, T-Mobile assumes for purposes of summary judgment that Borwick can establish a *prima facie* claim of pregnancy discrimination. My review is therefore confined to whether T-Mobile proffers a legitimate, non-discriminatory reason for its employment decision, and, if so, whether Borwick produces evidence sufficient to raise a genuine issue of material fact on the question of pretext. *Jaramillo v. Colo. Jud. Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005).  T-Mobile carries its burden; Borwick does not.

12

**1**

T-Mobile submits that it fired Borwick because she hung up on customers. Borwick maintains that she did not. The evidence, including Borwick's own testimony, belies her argument. T-Mobile therefore has established a legitimate, non-discriminatory reason for its decision.

The audio recordings combined with the corresponding reports, records, and notes from those January 28, 2011, calls, as well as affidavits from T-Mobile employees, demonstrate that Borwick hung up on at least four customers. The calls are short, were disconnected mid-sentence with Borwick speaking, and were manually released by the T-Mobile employee. The calls were also marked as "dead air" even though the required dead air script was never read and the customer could be heard on the line. Borwick admits it is her voice on the recordings. She further admits that the calls do not qualify as "dead air," and the evidence shows that she knows how to properly identify and handle "dead air" calls. Even if Borwick accidentally hit the release button on those calls, which she suggests could have happened, that does not explain why she documented the calls as "dead air." Similarly, if, as she claims may have happened, Borwick had multiple accounts up and documented the wrong calls as "dead air," that does not explain why she manually released incomplete calls. Furthermore, other evidence gave T-Mobile reason to believe that Borwick had hung up on customers on other occasions too. The short call percentages from September 2010 through January 2011 show that she had a very high percentage of short calls, and the trace call reports on Borwick show that her manually release calls in the 11 to 20 second ceased after the February 14 meeting. Accordingly, T-Mobile has proffered a legitimate, non-discriminatory reason for firing Borwick.

**2**

For her pregnancy discrimination claim to survive summary judgment, then, Borwick must

show that a genuine dispute of material fact exists as to whether T-Mobile's proffered reason is "unworthy of belief." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321 (10th Cir. 1997))). "Pretext exists when an employer does not honestly represent its reasons for terminating an employee." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005). "A plaintiff demonstrates pretext by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' " *Jaramillo*, 427 F.3d at 1308 (quoting *Morgan*, 108 F.3d at 1323 (quoting *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996))).

**(i)**

Borwick first impugns Lopez's investigation into her complaint that Cordiner was discriminating against her. To that end, Borwick asserts the following: Lopez admitted that there was no investigation into Borwick's complaints about pregnancy discrimination by stating that the investigation "has nothing to do with [her] pregnancy." Pl.'s Resp. at 17. Lopez's interviews simply consisted of talking to Borwick, Cordiner, and the two human resource specialists, and she did not interview Diaz or anyone else with whom Borwick worked. Lastly, Lopez did not bring Borwick's complaint to the human resource director for the Thornton call-center, Bruce Felderman.

There is no support in the record for Borwick's averment that Lopez did not complete any type of investigation into her allegations of discrimination. None. To fashion this argument, Borwick simply ignores the italicized portion of Lopez's statement that "*the investigation into [Borwick's] dropped calls* had nothing to do with her pregnancy; *rather, it stemmed from her mistreatment of*

14

*customers.*" Def.'s Mot. Ex. 9 at ¶ 17.   Moreover, there is ample evidence that Lopez indeed investigated Borwick's complaints. As Borwick herself admits, Lopez interviewed Borwick, Cordiner, Golden, and Ulanowski regarding the allegations.   Furthermore, because Borwick's complaint was based largely on Cordiner making the allegedly false accusation that Borwick was hanging up on customers, as part of her investigation, Lopez reviewed the evidence that Cordiner and Utschinski gathered in their respective disquisitions.

While Lopez did not interview Diaz or anyone with whom Borwick worked directly, this is not evidence of pretext. Diaz was Borwick's supervisor and Cordiner's subordinate, but based on the undisputed facts, that was irrelevant for purposes of investigating Borwick's allegations. Borwick's allegations were levied only against Cordiner. Borwick does not allege that Diaz or any other coworker witnessed any of Cordiner's allegedly disparate treatment. Diaz was only implicated in Borwick's allegations because, as Cordiner herself states, Diaz was the one who mentioned to Cordiner at the January 15 potluck that Borwick was pregnant.   She thus fails to explain why Diaz or anyone else should have been interviewed.   Her argument regarding Felderman is likewise unavailing.   She submits no evidence that Lopez was required to inform Felderman of the complaint, particularly when the evidence shows her complaint was baseless.   Lopez was, after all, a human resource *manager*. Borwick submits no other evidence that Lopez's investigation was otherwise inadequate, irregular, contravened T-Mobile policy, or in some other way evinces pretext. *See, e.g.*, *Jaramillo*, 427 F.3d at 1308. No reasonable jury could infer that Lopez's investigation raises a genuine dispute as to whether T-Mobile's proffered reason for firing Borwick was pretextual.

**(ii)**

Borwick also contends that Cordiner's conduct after learning she was pregnant shows

15

pretext. She alleges that after Cordiner learned she was pregnant, Cordiner suddenly became critical of her performance by falsely accusing her of hanging up on customers and that Cordiner began treating her worse by no longer greeting her as "Hon" and in one instance looking at her at her "in disgust."

With respect to Cordiner's allegedly false accusations as evidence of pretext, as discussed above, the evidence shows the accusations were true.  Furthermore, the evidence also shows that this was the focus of Cordiner's investigation from its inception. She was told in early to mid-January 2011 by Winkelman that Borwick had high short call percentages in December 2010, suggesting that she may be hanging up on customers.  Cordiner commenced an investigation shortly thereafter. She also candidly shared her concern and investigation with Borwick.  Her conclusion was then essentially affirmed by Utschinski after Utschinski conduct her own investigation.  For these reasons a jury could not find that Cordiner's investigation and accusation shows pretext.

Nor could a jury find that Cordiner's other conduct shows pretext. In the first instance, Borwick supports these allegations with nothing more than her own statements in an affidavit and deposition. She provides no witnesses corroborating Cordiner's alleged changed behavior towards her.  Additionally, even if true, these facts fail to give rise to an inference that Cordiner's actions were the result of pregnancy discrimination.  *See Kenfield v. Colo. Dept. of Public Health & Env't*, 837 F.Supp.2d 1232, 1241-42 (D. Colo. 2011) ("The mere fact that Ms. Bruce [a supervisor and the alleged discriminator and retaliator] was 'stern,' 'cold,' and 'confrontational' in interactions with some white people some of the time, but was always observed to be "friendly" and "gentle" with non-whites is not evidence that Ms. Bruce harbored any racial animus against white people in general, or Ms. Kenfield in particular. . . . A supervisor can certainly be stern, cold, or

confrontational with some employees of a particular race without harboring any prejudice against that race; indeed, a supervisor who is dissatisfied with certain employees' performance or who has a personal (non-prejudicial) dislike of the employees would very likely be cold and stern in her interactions with those employees, yet without ever harboring racial animus towards them."), Borwick also does not allege or establish that Cordiner treated others more favorably, a requirement for her claim. *Falk*, 2012 WL 2390556, *4 (citing *Khalik*, 671 F.3d at 1193).  To the contrary, the evidence shows that in the months preceding Borwick's firing, at least three other CSRs in the Thornton call-center who were not pregnant were terminated for hanging up on customers.

The evidence also fails to connect Cordiner to the decision to terminate Borwick.  The decision to terminate Borwick was made by Utschinski.  Borwick's allegations were aimed at Cordiner. Utschinski conducted her own investigation of Borwick's conduct and concluded Borwick had hung up on customers and attempted to hide it. Borwick does not allege otherwise. Consequently, she fails to connect Cordiner's actions to the decision terminate her, and that is required for Borwick to discharge her burden on the basis of Cordiner's alleged conduct. *See Atchley,* 180 F.3d at 1148-49 ("In this third stage of the discrimination analysis, the plaintiff must show pregnancy was a determinative factor *in the defendant's employment decision*, or show *the defendant's* explanation for its action was merely pretext.") (emphasis added).

For these reasons Cordiner's behavior does not raise a genuine dispute of fact as to whether T-Mobile's reason firing her was pretext for unlawful discrimination.

**(iii)**

Borwick's tertiary argument of pretext appears to be that her requested schedule adjustment was denied. She does not argue that her request was denied because she was pregnant; rather, she

argues that T-Mobile was "impermissibly focused on [her] pregnancy when it denied her schedule adjustment" request.  Pl.'s Resp. at 13 ¶ 1. In support, she submits only an excerpt from the time line that Lopez constructed as part of her investigation. The time line states that on February 14, 2011, Cordiner met with Borwick and Diaz to discuss that "Borwick's schedule adjustment request for daycare has been denied."  Pl.'s Resp. at 17; Def.'s Mot. Ex. 9 at 8.

T-Mobile explains that Borwick's request was denied because it did not meet the requirements of the company's new shift adjustment policy.  The evidence shows that the decision to deny her request was made by Lopez and resource planning team member Rebecca Wekesser. As human resources manager, Lopez reviewed and decided whether to approve a CSR's request for a schedule adjustment. Before February 2011, T-Mobile offered a "work/life" balance opportunity whereby employees could request shift adjustments to accommodate school, child care, or other life circumstances.  On two prior occasions, Borwick had previously applied for a shift modification on the basis that she needed time to complete her homework assignments for college courses she was taking.  These requests were granted under the old policy. Beginning in February 2011, however, T-Mobile determined that its business operations could no longer support the volume of adjustment requests it previously had.  As a corollary, it narrowed the circumstances under which schedule adjustments would be granted for shifts in February 2011 onward.  With respect to school conflicts, the new policy allowed a CSR to receive a schedule adjustment only where the CSR had a class that was scheduled during the CSR's work shift.  Borwick's January 27, 2011, adjustment request was submitted because she needed time to do homework. This did not meet the new policy's requirements. Plaintiff disputes none of this. Based on the foregoing, a jury could not find that the denial raises a genuine dispute that T-Mobile's proffered reason for firing Borwick was pretextual.

**(iv)**

Borwick also counters with evidence of her positive work performance.  *See* Pl.'s Resp. at 17-18.  She points to various metrics on her "quality historical reports" showing her performance, at least in those areas, was above average. Quality history reports are generated from Borwick's scores on an evaluation of the call recordings from eight random calls Borwick received during the report's period. She also submits her 2011 coaching report, updated in February 1, 2011, which does not mention short calls as a problem, and her positive 2010 annual review signed by Diaz.

None of this contradicts the evidence that Borwick hung up on customers on January 28, 2011, and that T-Mobile fired her for doing so. The quality historical report metrics are based upon eight random calls recorded during the period.  None of the calls on Borwick's were those from January 28, 2012, which Borwick had manually released and noted as "dead air."  Turning to the coaching report, there is no evidence that at the time Diaz completed it, she knew of Borwick's short call statistics or Cordiner's investigation. The same can be said for the annual review. Moreover, the annual review was for the previous year, 2010. The calls that T-Mobile used as the basis for its decision to terminate Borwick occurred in January 2011.  In short, no reasonable jury could conclude that this evidence of good performance raises a genuine dispute of material fact as to whether she hung up on four customers on January 28, 2011.  And that is the proffered basis for T-Mobile's decision to terminate her–not that she was chronically underperforming or had a poor 2010.  This evidence thus fails to raise a question whether T-Mobile's explanation for firing Borwick was subterfuge for unlawful discrimination.

19

**(v)**

Borwick's final effort to establish pretext rests on the temporal proximity between her pregnancy and her termination. She argues that the undipsuted fact that she was fired "a mere six" weeks after Cordiner learned she was pregnant raises a genuine issue of fact as to whether she was fired because she was pregnant.

While I may consider evidence of temporal proximity, it "alone is insufficient to raise a genuine dispute of material fact concerning pretext." *Proctor v. United Parcel Service*, 502 F.3d 1200, 1214 (10th Cir. 2007). I must therefore determine whether temporal proximity combined with the other evidence creates a reasonable inference that T-Mobile's asserted reason is unworthy of belief. It does not.

What is most problematic is that Borwick still does not demonstrate a genuine dispute of fact as to whether she hung up on customers on January 28, 2011. As stated, the evidence shows that Borwick hung up on customers and covered it up. T-Mobile also demonstrates that it has been consistent in its reason for investigating and firing her and that it decided to fire her after three thorough, independent investigations (two into Borwick's conduct and one into her complaint). Borwick submits no evidence that contradicts the reports, records, and audio recordings before me. She submits no evidence that she was treated differently from other employees suspected of hanging up on customers. Indeed, the only piece of evidence from which a jury could infer pretext is the timing of her firing vis-a-vis Cordiner learning of her pregnancy, but that alone cannot save the claim from summary judgment. *Proctor*, 502 F.3d at 1214. At best the timing creates a weak issue of fact as to whether the T-Mobile's reason for firing her was untrue; but because the evidence as a whole overwhelmingly shows that T-Mobile fired her hanging up on customers, her claim still

cannot withstand summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

### B.
### Retaliation

### 1

Title VII proscribes an employer from retaliating against an employee because she "opposed" any practice made unlawful by Title VII. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (quoting 42 U.S.C. § 20003-3(a)). Where, as here, there is no direct evidence of retaliation, a retaliation claim is analyzed under the *McDonnell Douglas* burden shifting framework delineated *supra*. *Id.* Hence, an employee must first present a *prima facie* case of retaliation. *Id.* This means showing that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." *Duncan v. Manager, Dept. of Safety, City and Cnty of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005).

### 2

T-Mobile again assumes that Borwick can establish a *prima facie* case and reasserts that it fired her for hanging up on customers. Consequently, because I already concluded this reason is legitimate and non-discriminatory, I confine my analysis to whether Borwick produces evidence sufficient to raise a genuine issue of material fact on the question of pretext. *See Jaramillo*, 427 F.3d at 1307. She does not.

My pretext analysis above is equally applicable here. Aside from the temporal proximity between her February 22 complaint and February 28 termination, Borwick simply presents no evidence that raises a genuine dispute as to whether T-Mobile's reason for firing her is unworthy of belief. As stated, temporal proximity alone is still not enough to defeat summary judgment. *Proctor*, 502 F.3d at 1214. This is particularly true here. The evidence shows that the investigation into Borwick's conduct and the findings therefrom are what led to Borwick's termination. And it is undisputed that the investigation began, evidence was collected, and findings were made (at least by Cordiner) *before* Borwick engaged in protected activity by filing her complaint. The investigation began in late January and had progressed far enough that on February 14 and 18, days before her February 22 complaint, Cordiner met with Borwick, presented the evidence she had gathered, and informed her that she believed Borwick was hanging up on customers.

For these reasons, and for those discussed in Part III.B.2(v), *supra*, I conclude that Borwick has not shown a genuine dispute of material fact as to whether T-Mobile's proffered reason for firing her is pretext. Accordingly, her retaliation claim cannot withstand summary judgment. *See Atchley*, 180 F.3d at 1149 ("Failure to come forward with evidence of pretext after the employer articulates a legitimate nondiscriminatory reason for its action will entitle the defendant to judgment.").

## C.
## FMLA

### 1

The FMLA affords "up to twelve weeks of unpaid leave . . . for serious health conditions and reinstatement to the former position or an equivalent one upon return from that leave." *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006). The "birth of a son or daughter" entitles an employee to such leave. 29 U.S.C. § 2612(a)(1)(A). The FMLA proscribes

employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under [thereunder]." 29 U.S.C. § 2615(a). An employer, however, may fire an employee if the firing would have occurred regardless of the employee's request for or taking of FMLA leave. *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002)

FMLA claims are generally asserted under two separate theories: the retaliation theory or the interference theory. *Smith*, 298 F.3d at 960. Plaintiff asserted both in her complaint. *See* Pl.'s Compl. at ¶¶ 43, 44 (Defendant *interfered* with Plaintiff's right to use FMLA for her pregnancy. Plaintiff was terminated *in retaliation* for attempting to use FMLA."). She makes clear in her proposed pretrial final order and response, however, that she asserts only the interference theory. *See* Proposed Pretrial Order (Final) by Plaintiff, Doc. # 39 at 2 ("CLAIMS AND DEFENSES: . . . Borwick further asserts that the Defendant engaged in retaliation in violation of Title VII and interfered with her right to use the Family Medical Leave Act . . . ."); Pl.'s Resp. at 18-20 (in "Family Medical Leave Act" section, discussing and defending only the interference theory."). I therefore discuss only interference.

## 2

To make out an FMLA interference claim, the plaintiff must show (1) that she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with her right to take that leave, and (3) that the employer's action was related to the exercise or attempted exercise of her FMLA rights. *Metzler*, 464 F.3d at 1180. Importantly, the *McDonnell Douglass* burden-shifting framework is inapplicable. *Id.*

T-Mobile argues that Borwick cannot establish the third element. It explains that Borwick's interference claim is based on the single statement she allegedly made at the January 15 potluck that

she intended to take her full 12 weeks of FMLA leave closer to the birth of her child.  T-Mobile contends that this statement does not constitute "the exercise or attempted exercise" of Borwick's FMLA rights. And because it is undisputed that Borwick neither requested FMLA leave nor took it, T-Mobile maintains she cannot establish that she "exercised or attempted to exercise" her FMLA rights.  It further argues that Borwick has failed to adequately establish that its decision to fire her "was related" to her January 15 comment.  I agree with T-Mobile.

Looking at T-Mobile's leading argument first, it is undisputed that Borwick never requested FMLA leave. "The FMLA, however, does not require a covered employee to specifically ask for FMLA benefits. An employee need not expressly assert rights under the FMLA or even mention the FMLA." *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 997 (10th Cir. 2001) (citing 29 C.F.R. §§ 825.302(c), 825.303(b)). Instead, the Tenth Circuit has stated that an "employer's duties [under the FMLA] are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (10th Cir. 1999).  To provide such notice "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c); *accord Dreesen v. Denver Newspaper Agency*, 2010 WL 1348569, *6 (D. Colo. Mar. 30, 2010) (unpublished) ("While it is arguable that defendant did have information that might have led it to anticipate a future request for leave, the Court finds, at least in relation to interference with substantive rights, that the FMLA requires at least some affirmative conduct by plaintiff to invoke those rights.") (citing and parenthetically quoting 29 C.F.R. § 825.302(c)).

Assuming that Borwick indeed made the January 15 comment, it gave no indication as to the

"anticipated timing" of her leave. 29 C.F.R. § 825.302(c). It did not specify her due date or the date on which she would take leave. It did not contain any other piece of information, such as how far along Cordiner was in her pregnancy, from which Cordiner would have been able to approximate when Borwick would take leave. Combine this with the fact that when she made the January 15 comment, and when she was terminated, Borwick was still months away from any expected leave. I underscore that Borwick never requested leave to give birth to her child and that no evidence suggests that she conveyed her need to do so other than with the comment at the January 15 potluck. Borwick identifies no authority for permitting an interference claim to proceed under these circumstances.  Moreover, courts analyzing FMLA interference claims with similar facts have concluded that the plaintiff failed to provide notice sufficient to invoke her FMLA rights.  *See, e.g.*, *Ernisse L.L. & G., Inc.*, 2008 WL 4499974 (D. Kan. Sep. 29, 2008) (unpublished); *Dreesen*, 2010 WL 1348569, *6,  *6  n.13. For these reasons Borwick has not shown a genuine dispute of fact as to whether she exercised or attempted to exercise her FMLA rights so as to trigger the FMLA's protections.

Even, assuming, *arguendo*, that Borwick indeed triggered her FMLA rights, her interference claim cannot withstand summary judgment because she fails to adequately show that her termination was related to her January 15 comment or her intent to take FMLA leave.  All that she offers in an effort to demonstrate relatedness is that she was pregnant when she made the January 15 comment and that she was terminated six weeks later.  The timing between her January 15 comment and her dismissal "may" indicate a causal relationship between the two, *see Smith*, 298 F.3d at 961 (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), but here it does not. This is because the evidence taken together shows that T-Mobile would have terminated Borwick

regardless of her January 15 comment because it discovered that she hung up on customers. The evidence demonstrates that T-Mobile conducted two thorough, *bona fide* investigations into Borwick's conduct from which three T-Mobile employees, as well as the Court, concluded that Borwick had indeed hung up on customers.  It also shows that in T-Mobile terminates CSRs who deliberately hang up on customers and had done so recently.

Borwick does not allege or submit any evidence other than the timing of her firing from which a jury could reasonably infer her intent to take leave was related to her firing. For example, there is no evidence that her January 15 comment or intent to take FMLA were ever raised or alluded to in any of the meetings between her and her superiors or that either was ever discussed amongst her superiors. I note that Borwick's February 22 letter complaining about Cordiner does not even allege unfair treatment on the basis of her intent to take leave to have her child. In fact, it does not mention the FMLA or her intent to take leave at all.  Moreover, there is no evidence that the person who actually decided to fire Borwick–Utschinski–knew about Borwick's January 15 comment or any intent to take FMLA leave when her child was born.

If Borwick believes that merely requesting FMLA leave insulates an employee from being terminated for unrelated reasons, she is mistaken.  *See, Smith*, 298 F.3d at 960; *accord Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998). "[A]n employee may be dismissed, preventing her from exercising her statutory right to FMLA leave ... if the dismissal would have occurred regardless of the employee's request for . . . FMLA leave." *Metzler*, 464 F.3d at 1180 (internal quotations omitted). The evidence shows that T-Mobile would have dismissed her regardless of her January 15 comment because it determined she had hung up on customers.

Accordingly, this claim cannot withstand summary judgment.

26

**IV. Conclusion**

For the foregoing reasons, IT IS ORDERED that T-Mobile's Motion for and Memorandum in Support of Summary Judgment [**Doc # 23**] is GRANTED, and this action is DISMISSED with costs awarded to T-Mobile.


Date: January __22__ 2013, in Denver, Colorado.

BY THE COURT:


    s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE